IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| EDWIN T. SCOTT, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:18-CV-87-D |
| | § | |
| NANCY A. BERRYHILL, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION TO
AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff Edwin T. Scott, Jr. ("Scott") brings this cause of action under 42 U.S.C. § 405(g) seeking review of a final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner"), denying Scott's application for disability insurance benefits and supplemental security income ("benefits"). The undersigned United States Magistrate Judge recommends the Commissioner's decision finding Scott not disabled and not entitled to benefits be affirmed.

## I.    BACKGROUND

### A.  Procedural History

Scott seeks judicial review of the final decision of denial of benefits. [ECF 1 at 2]. Scott applied for benefits on March 12, 2013 claiming he has been unable to work since September 12, 2009 due to the following conditions: neuropathy, clubfoot, plantar fasciitis, bilateral knee pain, bilateral carpal tunnel syndrome, cervical spine pain, hearing loss, anxiety, a personality disorder, and posttraumatic stress disorder. (Tr. 71–72, 415–16). On April 23, 2015 the ALJ denied Scott's claims [ECF 1 at 2]; however, on August 9, 2016 the Appeals Council vacated the ALJ's decision and remanded the case for rehearing. (*Id*). On January 19, 2017 the ALJ held the post-remand hearing and, on May 2, 2017,

again denied benefits. (*Id*). The Appeals Council denied Scott's second request for review, and the ALJ's second decision became the final administrative decision. (*Id*). Scott timely appealed.

### B. Factual History

#### 1. Age, Education, and Work Experience

Scott was born January 31, 1971 and was almost 46 years old at the time of the January 19, 2017 hearing. (Tr. 192). He attended school through the 11th grade and received his GED in 1990. (Tr. 193, 518). He attended law enforcement training and received a Bachelor of Science degree in criminal justice. (Tr. 194). Scott has past relevant work ("PRW") as an armored car guard and driver (2001–05), military police officer, guard (1994–99), non-military police officer, convenience store clerk (2005–07), and communications equipment technician (2003–07). (Tr. 211–12, 465, 519).

#### 2. Medical Evidence

##### a. 2008 and 2009

From December 9, 2008 to August 8, 2009, an eight-month period, Scott presented to Dr. Sicher, a podiatrist, at least seven times with complaints of pain and tenderness in his toes, arches, and heels. (Tr. 891, 895, 841, 840, 839, 838, 956). Dr. Sicher diagnosed Scott with plantar fasciitis due to arch instability (Tr. 891), hallux limitus of both feet (Tr. 895), and tendonitis (Tr. 841). Dr. Sicher treated Scott with injections in his toes for pain (Tr. 895, 839), topical gel (Tr. 893), shoe inserts (Tr. 893), and a night splint for his right foot (Tr. 895). Physical therapy ("PT") for four to six weeks was also prescribed. (Tr. 841).  For about a two-week period in early April 2009, Scott attended five PT sessions. (Tr. 699, 701–04). Scott tolerated the exercises well according to treatment notes, but stated the relief lasted only a few hours after the sessions. (Tr. 701–04). The treatment notes show Scott was performing physical tasks at home, such as climbing up and down a ladder many times and digging and lifting while trying to fix a leak. (Tr. 701, 704). PT notes from August 2009 show Scott did not return after his April 17th session. (Tr. 705). On August 8, 2009 Dr. Sicher ultimately advised Scott he would need surgery on his left foot to remodel the dorsal aspect of the head of the toe. (Tr. 838, 956).

From mid-August to mid-September 2009, Scott presented to Dr. Siemens at Concentra Urgent Care four times for a work-place injury that occurred when he was detaining a shoplifting suspect. (Tr. 715, 722, 720, 717). On August 16, 2009, the date of injury, Dr. Siemens diagnosed Scott with a lumbar strain and prescribed PT for two weeks. (Tr. 709). On August 24, 2009 Scott reported that his pain level was at 10/10, he had shooting pain in both legs and his left knee, severe pain in his lower back, and that moving exacerbated the pain. (Tr. 772). Scott stated he took Vicodin he was prescribed previously for a toothache to alleviate the pain. (*Id*.). Dr. Siemens' gross exams of Scott's lumbar spine and left knee were normal, and Scott demonstrated a "normal gait with no evidence of limp." (*Id*.). Dr. Siemens ordered an MRI on Scott's back, thigh, and left knee and diagnosed him with lumbar radiculopathy and strain, thigh sprain, and knee strain. (Tr. 724). On August 28, 2009 Scott followed up with Dr. Siemens and stated he ran out of his medications, the pain had not improved, and he had difficulty performing his job even with the restrictions. (Tr. 720). Dr. Siemens noted Scott walked with "an antalgic and halting gait." (*Id*.). On September 4, 2009 Scott again followed up and reported no improvement and continued difficulty performing his job, but had not been to PT in the past week as prescribed. (Tr. 717). Dr. Siemens noted the lumbar spine and left knee were normal on gross exam, but that Scott walked with a halting and antalgic gait. (Tr. 717–18). Dr. Siemens recommended Scott continue PT. (*Id*.). A September 14, 2009 note from the physical therapist stated PT would benefit Scott and help decrease pain in his lower back and that he had tolerated treatment well up to that point. (Tr. 710, 712). On September 15th Scott followed up with Dr. Siemens and reported continued difficulty performing his job with restrictions and severe pain. (Tr. 715). Dr. Siemens described Scott's gait as antalgic, diagnosed him with chondromalacia of the knee and lumbar radiculopathy, strain, and disc herniation. (Tr. 716). Scott was advised to continue the treatment plan and return to the clinic as needed. (*Id*.).

**b. 2010**

On January 26, 2010 Dr. Burgesser examined Scott at the Commissioner's request and diagnosed him with loss of lumbar lordosis based on spinal x-rays but observed normal disc spaces and no other issues. (Tr. 1139, 1141).

From February 8th to June 16, 2010 Scott presented to his primary care provider, Nurse Practitioner Wanda Clark ("NP Clark"), five times for various issues, including rashes, depression, back pain, requests to fill out disability forms, requests for pain medications, requests for referrals to a neurologist, headaches, and numbness. (Tr. 951, 970, 981, 994). At a March 29, 2010 examination, NP Clark referred Scott to Dr. Sudhakar, a neurologist. (Tr. 993). On June 16th Scott requested a hydrocodone prescription from NP Clark and stated he was taking more Ultram/Tramadol than prescribed. (Tr. 994). Scott was advised to take his medication as prescribed and to lose weight and exercise. (Tr. 996).

On October 4, 2010 Scott presented to Dr. Sudhakar complaining of low back pain. (Tr. 1292). A cranial nerve exam, motor system exam, and sensory testing showed only mild decrease of pinprick sensation in his lower limbs. (*Id.*). Dr. Sudhakar relied on a 2009 MRI of Scott's lumbar spine to conclude there was disc lesion at T12/L1 and stenosis at L5/S1. (Tr. 1293). An MRI of his left knee showed chondromalacia of the patella. (*Id.*). Dr. Sudhakar reported Scott had low back pain, diffuse axonal type of sensory and motor polyneuropathy, major depression, polyarthritis, and chronic pain syndrome. (*Id.*). Dr. Sudhakar prescribed hydrocodone and Neurontin. (*Id.*). An October 8, 2010 MRI of Scott's brain showed no abnormalities. (Tr. 1295). On October 22nd Dr. Sudhakar prescribed a temporary disability placard. (Tr. 1302).

On October 23, 2010 Scott presented to the Golden Plains Community Hospital Emergency Room ("GPCH ER") following a fall that injured his back and left pinky toe. (Tr. 1350–51). Scott was diagnosed with a low back strain and fracture of his toe after x-rays. (Tr. 1353–55). His toes were taped, and he was given prescriptions for Lortab and Flexeril and discharged. (Tr. 1354).

On December 1, 2010 Scott presented to NP Clark with multiple complaints and requests, including pain and falling, a referral to a podiatrist that accepts Medicaid, and tooth pain. (Tr. 997). NP Clark noted Scott walked with a cane due to unsteady gait and balance. (Tr. 999). Scott was advised to exercise regularly and lose weight. (Tr. 1000). Scott also presented to Dr. Sudhakar complaining of low back pain, tingling, and problems with his feet, with treatment notes showing Scott exhibited difficulty walking. (Tr. 941). Sensory study responses showed deficits, motor study responses showed peroneal motor distal latencies, and a needle EMG study showed an early axonal type of sensory motor neuropathy. (*Id*.). Dr. Sudhakar's notes also showed radiculopathy at L5/S1 of a chronic nature. (*Id*.). On December 13, 2010 Dr. Sudhakar prescribed Scott a "walking cane for balance." (Tr. 1313). On December 22, 2010 a podiatrist at the Amarillo Foot Clinic requested a handicapped placard for Scott. (Tr. 862).

### c. 2011 and 2012

From February to August 2011, Scott presented to NP Clark three times complaining of various issues, including lack of sleep, chest congestions, swelling in his feet, difficulty swallowing, lower back pain, and requests for refills on all medication before Scott's Medicaid benefits terminated. (Tr. 1002–03, 1007, 1019). Treatment notes from August 29, 2011 reflect Scott exhibited an abnormal gait and walked with a cane. (Tr. 1020). A swallow study done at BSA on June 7, 2011 showed normal results and stated the "findings did not support [patient's] complaints." (Tr. 1016–17).

On December 7, 2011 Scott presented to NP Clark complaining of acid reflux, as well as chronic back pain, foot pain, and foot numbness. (*Id*.). NP Clark noted mild lordosis, gait abnormality, and that Scott was using a cane; she directed him to continue his current medications, lose weight, and exercise. (Tr. 1024–25). On March 6, 2012 Scott presented to NP Clark to obtain clearance for a dental procedure due to his high blood pressure. (Tr. 1026). Scott complained of chronic headaches and stated he lost his Medicaid and could not afford to see his specialists anymore, including his neurologist, Dr. Sudhakar. (*Id*.). NP Clark advised he should continue to see the neurologist if he still needs

Hydrocodone. (*Id*.). NP Clark noted musculoskeletal degenerative changes and gait abnormality. (Tr. 1027–28). She also noted the following:

> Pt. appears to be a hypochondriac. He doesn't smile, he doesn't laugh. He talks in a monotone voice. Can only talk about the bad things in his life, there isn't anything good. He appears to have educated himself well on all medical terminology and uses this terminology when describing his symptoms and pain, as well as self-diagnosing.

(Tr. 1028). Scott was prescribed medication to lower his blood pressure and advised to lose weight and exercise. (*Id*.).

On March 29, 2012 Scott presented to the GPCH ER at 10:58 AM with complaints of chest pain, nose bleeds, and difficulty swallowing. (Tr. 764). He reported his pain level was a 9/10. (*Id*.). Scott was given prescriptions and discharged at 12:27 PM. (Tr. 765). Scott presented to NP Clark around 2:48 PM the same day with complaints of nose bleeds for four days and a sore throat for three weeks. (Tr. 1030). His pain level was a 0/10. (*Id*.). He also complained of fatigue, frequently waking up gasping for air, and shortness of breath with exertion. (Tr. 1030–31). NP Clark prescribed a z-pak and nasal spray for sinusitis, as well as medication to assist with the shortness of breath, and ordered a chest x-ray. (Tr. 1032). Scott was advised to monitor his blood pressure, lose weight, and exercise. (Tr. 1033).

On April 10, 2012 Dr. Sudhakar completed a Supplemental Attending Physician Statement noting Scott's diagnoses were lumbago and radiculopathy at L5. (Tr. 1310). Dr. Sudhakar noted Scott walks with a cane and opined Scott cannot sit or stand for more than 30 minutes at a time and should avoid lifting, pulling, and pushing. (*Id*.). Dr. Sudhakar stated it was "unknown" whether Scott could work without restriction. (*Id*.).

On May 1, 2012 Scott presented to NP Clark to again obtain clearance for a dental procedure due to his blood pressure. (Tr. 1034). Scott was cleared for the dental procedure and advised to lose weight and exercise. (Tr. 1035).

On June 7, 2012 Scott presented to Dr. Sudhakar with complaints of low back pain and foot pain. (Tr. 934). Treatment notes state Scott was in good general health, had a normal gait, and normal muscle strength and tone, but also had abnormal mild weakness in hip flexion on his right side, dizziness, headaches, and numbness in his feet. (Tr. 934–37). Sudhakar also noted decreased sensation with pin prick in Scott's lower limbs. (*Id*.). Dr. Sudhakar's diagnoses were lumbago and diffuse axonal sensory motor polyneuropathy, for which he scheduled a follow-up exam in six months. (Tr. 937–38).

On September 20, 2012 Scott presented to NP Clark with complaints of headaches and back pain. (Tr. 1037). Scott reported his pain level was an 8/10 in his back and had been for years. (*Id*.). Treatment notes indicate Scott walked with a cane because of his back pain and abnormal gait and appeared depressed due to his continual "focus on all of his disabilities" that he "can't seem to see past." (Tr. 1038). Scott was screened for diabetes, scheduled for a complete metabolic and lipid panel, and directed to lose weight and exercise. (Tr. 1038–39). On November 11, 2012 an x-ray of Scott's right knee showed minimal degenerative changes and no acute or significant chronic bony abnormality. (Tr. 769). On November 19, 2012 an MRI of Scott's right knee showed normal results. (Tr. 770).

### d. 2013

On February 11, 2013 Scott presented to Dr. Sudhakar with complaints of pins and needles in his feet and low back pain. (Tr. 929). Treatment notes indicated Scott was in good general health, despite reports of dizziness, headaches, numbness, arthralgia, myalgia, excess weight, and weakness in his lower limbs. (Tr. 929–30). His motor tone and power, gait, and muscle strength and tone were all normal. (Tr. 932). He reported using a cane to get around, difficulty getting in and out of a car, constant neck pain, and falling three months ago because of right knee pain, resulting in a trip to the emergency room. (Tr. 929).

On March 4, 2013 Scott presented to NP Clark with complaints of neuropathy-type pain, headaches, and fatigue. (Tr. 1045–46). He reported his back-pain level was a 6/10. (Tr. 1045). According to Scott, he had been denied disability benefits and was being forced to find a job, but Dr.

Sudhakar would not release him for work. (Tr. 1046). Scott requested his testosterone levels be checked. (Tr. 1047). NP Clark noted hypothesia and a gait abnormality, discussed the importance of following a weight reduction diet and a routine exercise program, and prescribed blood pressure medication. (*Id*.).

On May 24, 2013 Scott underwent a mental status examination with Dr. Gradel who noted Scott's posture and gait were normal. (Tr. 1075). Dr. Gradel diagnosed Scott with dysthymic disorder with atypical features, pain disorder due to medical condition and the associated psychological factors, and anxiety disorder: PTSD type. (Tr. 1078).

On June 11, 2013 Dr. Burgesser examined Scott for the second time and diagnosed him with probable spondylosis at L5, but no acute bony abnormality, based on the lumbar spine x-ray taken that day. (Tr. 1083). She further concluded Scott had a hallux valgus deformity on his left foot based on the x-ray taken that day. (Tr. 1084). Dr. Burgesser's treatment notes state Scott reports pain in his mid and lower back, and pain with straight leg raising, but that he can bend over and touch his toes. (Tr. 1086). She noted Scott walked with a cane but had a normal gait, could sit, stand, move about, lift carry and handle objects, reach, handle, and finger-feel, but could not heel-toe walk, hop, or squat. (*Id*.) Dr. Burgesser found Scott showed no fatigue or shortness of breath during the exam. (*Id*.).

On July 2, 2013 Dr. Sudhakar completed another Supplemental Attending Physician's Statement opining Scott cannot walk or sit for more than half an hour due to pain and cannot do sustained physical activity. (Tr. 1312). Dr. Sudhakar noted his objective medical findings to be decreased movement of the lumbar spine due to lumbago, diffuse axonal sensory motor polyneuropathy, and radiculopathy at L5. (*Id*.).

On July 11, 2013 Scott presented to Dr. Sudhakar with complaints of low back pain, pain in his lower limbs, and burning feet. (Tr. 1090). Treatment notes state Scott was not in good general health, reported fatigue, double vision, sinusitis, headaches, numbness, shortness of breath, coughing,

wheezing, arthralgia, myalgia, and presented with excess weight. (Tr. 1090–92). His motor tone and power were normal, as well as his gait and muscle strength and tone. (Tr. 1093).

On July 19, 2013 Scott presented to GPCH ER with a chief complaint of back pain that started when he was pulling up carpet at his home. (Tr. 1101–02). Scott reported he had been disabled for the past four years. (*Id*.). A lumbar spine x-ray showed minimal degenerative changes. Scott was diagnosed with a low back strain, given a prescription for Flexeril, and discharged. (Tr. 1104).

On September 9, 2013 Scott presented to NP Clark to follow up on hypertension, chronic back pain, and allergies. (Tr. 1128). His blood pressure was 145/90, he reported back pain as an 8/10, and indicated he still experienced chronic headaches. (*Id*.). Scott again reported he had been denied disability benefits multiple times and had started walking and eating healthier as a result, which lead to a twelve-pound weight loss. (Tr. 1129). NP Clark noted he walked with a cane and had an abnormal gait due to his back. (Tr. 1130). She treated him for hypertension and chronic pain syndrome and ordered a complete metabolic panel, lipid panel, and diabetes screen. (Tr. 1130–31).

### e. 2014

On February 19, 2014 Scott presented to Dr. Sudhakar with complaints of low back pain and difficulty walking. (Tr. 1331). Treatment notes indicate Scott reported low back pain, sleep apnea, headaches, a limited exercise tolerance, fatigue, blurred vision, numbness, weakness, arthralgia, myalgia, and exhibited excess weight but had good general health. (Tr. 1331–33). His motor tone and power were normal, and his gait and muscle strength and tone were normal. (Tr. 1334). Dr. Sudhakar's treatment notes indicate diagnoses for lumbago, diffuse axonal sensory motor polyneuropathy, carpal tunnel syndrome, depression, chronic migraines, and cystitis. (*Id*.).

On March 5, 2014 Scott presented to NP Clark complaining of various issues. (Tr. 1343). Scott stated he was applying for disability and needed NP Clark to let him know what was wrong with him. (Tr. 1344). He reported he could not stand for any period of time due to pain in his feet and that he was depressed but did not want medication for the depression because he would be unable to sell guns.

(*Id*.). He complained of chronic fatigue and reported he had no energy. (*Id*.). Scott indicated he was not exercising and had gained six pounds. (*Id*.). NP Clark noted Scott exhibited weakness and an abnormal gait (Tr. 1346), and advised him regarding his diet and to lose weight and exercise. (Tr. 1347).

On April 10, 2014 Scott presented to GPCH ER and was diagnosed with heel spurs based on the x-rays taken. (Tr. 1369, 1374).

On May 13, 2014 Scott presented to Nurse Practitioner Dean Cates ("NP Cates") complaining of cold symptoms, left foot pain, sinuses, and hypertension. (Tr. 1655). Scott was treated for plantar fasciitis and acute sinusitis. (Tr. 1656). Scott followed up with NP Cates on May 27th complaining of continued pain in his left foot. (Tr. 1651). His medication was refilled, and he was advised to continue stretching exercises due to his plantar fasciitis. (Tr. 1652).

On June 18, 2014 Scott presented to Dr. Sudhakar with complaints of low back pain at a level of 9/10, headaches, left foot pain, numbness and burning in his feet, and sleep apnea. (Tr. 1385). Treatment notes state he was in good general health, but had fatigue, numbness, myalgia, and excess weight. (Tr. 1385–87). Scott's motor tone and power were normal, and his gait and muscle tone were normal, with mild weakness in lower limbs. (Tr. 1388). Dr. Sudhakar's treatment notes indicate diagnoses for lumbago, diffuse axonal sensory motor polyneuropathy, carpal tunnel syndrome, depression, chronic migraines, sleep apnea, and obesity. (*Id*.).

On July 30, 2014 Scott presented to GPCH ER with complaints of chest pain. (Tr. 1390). His blood pressure was 136/68, and the EKG results were normal. (Tr. 1390, 1393). Scott was advised to follow up with a cardiologist and discharged. (Tr. 1393–94). The next day on July 31st, Scott saw NP Cates to follow up on continued chest pain and requested a sleep apnea study. (Tr. 1648). Treatment notes indicate his blood pressure was 116/54 and his range of motion, muscle strength, and stability in his extremities were normal. (Tr. 1649).

On August 4, 2014 Scott presented to Dr. Nambiar, a cardiologist, with complaints of chest pain, left arm numbness, and sleep apnea. (Tr. 1404). Dr. Nambiar noted that Scott walked with a cane and had an unsteady gait. (Tr. 1406). Dr. Nambiar recommended tests to evaluate complaints of chest pain and left ventricular valvular function. (Tr. 1407). An August 12, 2014 Lexiscan stress myocardial perfusion test showed mildly decreased ventricular ejection fraction on the left ventricular valve of 48%. (Tr. 1443).

On September 23, 2014 Scott presented to NP Clark with complaints of all over pain at a level of 9/10. (Tr. 1520). NP Clark noted a gait abnormality and that Scott walked with a cane. (Tr. 1523). Scott's medications were adjusted; he was scheduled for a complete metabolic and lipid panel and diabetes screening and was also advised to lose weight and exercise. (Tr. 1523–24).

On September 25, 2014 Scott was treated for a stumped left pinky toe at GPCH ER. (Tr. 1444). An x-ray of the toe showed normal results. (Tr. 1447). The toe was wrapped and put in a post-operative boot, and Scott was discharged with a referral to Dr. Landers, an orthopedic surgeon. (Tr. 1446). On October 1, 2014 Scott presented to Dr. Landers and reported continued pain in his toe. (Tr. 1452). Dr. Landers diagnosed him with a contusion of the left pinky toe and advised Scott to continue conservative care. (Tr. 1454).

On October 2, 2014 Scott followed up with cardiologist Nambiar, reporting off and on chest pain. (Tr. 1414). Treatment notes state Scott's gait, strength, and posture were normal. (Tr. 1416). Dr. Nambiar advised Scott to continue his medication, follow a weight reduction plan, and increase his activity levels. (Tr. 1417).

On November 18, 2014 Scott presented to NP Cates with complaints of nose bleeds and sinus symptoms. (Tr. 1474). NP Cates noted Scott's range of motion, muscle strength, and stability in extremities were normal. (Tr. 1476). On November 21, 2014 Scott presented to NP Cates with complaints of problems with his teeth. (Tr. 1478). NP Cates again noted his range of motion, muscle strength, and stability in extremities were normal. (Tr. 1478–79).

### f. 2015-2016

On March 5, 2015 Scott presented to NP Clark with complaints of back pain and an eye infection. (Tr. 1504). Scott reported he was taking hydrocodone for his back pain, but Dr. Sudhakar would not refill the prescription due to new federal guidelines. (Tr. 1505). NP Clark noted Scott had an abnormal gait and walked with a cane. (Tr. 1507). She treated him for hypertension and conjunctivitis and advised him to lose weight and exercise. (Tr. 1507–08).

On March 16, 2015 Scott presented to Dr. Sudhakar with complaints of low back pain, burning pain in his feet, and sleep apnea, with the treatment notes stating Scott was in good general health and had lost 30 pounds, but reported numbness, weakness, arthralgia, and myalgia. (Tr. 1713–15). The notes also showed normal motor tone, power, gait and muscle tone, with mild weakness in the lower limbs. (Tr. 1388).

On April 1, 2015 Scott saw NP Cates for tooth pain. (Tr. 1635). NP Cates noted Scott's range of motion, muscle strength, and stability in the extremities were normal and gave him a prescription to help with the dental abscess. (Tr. 1637). An x-ray of Scott's facial bones showed normal results. (Tr. 1538).

On May 22, 2015 Scott saw Nurse Practitioner Lindsey Hardin ("NP Hardin") for problems with hearing and dizziness. (Tr. 1631). Scott requested an MRI of his spine for disability needs and that his records be sent to his caseworker. (*Id*.). Treatment notes show normal range of motion, muscle strength, and stability in extremities. (Tr. 1633). NP Hardin directed Scott to continue his medications and proceed with the MRI as desired and noted he would benefit from PT to strengthen his back muscles. (Tr. 1634).

On June 11, 2015 Scott saw Dr. Nambiar for a follow up regarding hypertension and shortness of breath. (Tr. 1591). Treatment notes show Scott's gait was steady and his posture was normal. (Tr. 1593). Dr. Nambiar also noted Scott's concern about losing his gun license if he saw a psychiatrist for his depression and anxiety. (Tr. 1594).

On June 18, 2015 Scott presented to GPCH complaining of nausea, pressure in his ears, and headaches. (Tr. 1535). He was diagnosed with a headache and given an injection of Toredol. (Tr. 1537).

On August 11, 2015 Scott presented to Dr. Sudhakar with complaints of low back pain and difficulty walking. (Tr. 1487). Treatment notes state Scott uses a cane and cannot sit or stand for more than ten minutes. (*Id.*). He was in good general health, but also presented with fatigue, dizziness, arthralgia, myalgia, excess weight, and an abnormal gait. (Tr. 1487–89). A Supplemental Attending Physician's Statement dated August 12, 2015 lists Scott's diagnoses as: lumbago, axonal sensory neuropathy, and migraines. (Tr. 1720). Dr. Sudhakar further noted Scott could not sit or stand for more than 15 minutes, could only walk a few feet and not more than ten minutes, and uses a cane. (*Id.*).

On September 2, 2015 Scott presented to NP Clark with complaints of hypertension and a rash on his feet. (Tr. 1493). NP Clark noted a gait abnormality and that Scott walked with a cane. (Tr. 1496). She advised Scott to lose weight and exercise. (Tr. 1497).

On November 30, 2015 Scott presented to NP Hardin after injuring his back when he bent down to put dog food in a bowl. (Tr. 1627). He reported pain as an 8/10, that he had trouble walking, was taking "left over hydrocodone," and had unbearable pain when he tried to walk. (*Id.*). NP Hardin noted a gait disturbance, ordered spinal x-rays, and went over proper body mechanics. (Tr. 1628–29). NP Hardin informed Scott she would not refill pain medication because he is under the care of a neurologist who prescribes his pain medication. (Tr. 1629). An x-ray of Scott's lumbar spine taken that day showed minimal ventral spondylosis from L1–2 to L4–5 without significant disc space narrowing. (Tr. 1534).

In February and July of 2016 Scott presented to NP Hardin complaining of issues with his eyes, ears, and cheekbones. (Tr. 1623, 1617). At a July 29, 2016 appointment Scott informed NP Hardin he still had low back pain, was attempting to get on disability, wanted back and bariatric surgery, could only stand for 10-15 minutes, and needed disability to get various surgeries. (Tr. 1617). Treatment

notes state Hardin had been caring for Scott for the past year and that he was fully ambulatory at office visits without assistive devices. (Tr. 1621).

On August 11, 2016 Scott presented to Physician Assistant Gayle Fristoe after closing his right hand in a car door. (Tr. 1612). An x-ray of his hand showed an old fracture-deformity but was otherwise normal. (Tr. 1533). Scott was advised to heat and elevate his hand and take Tylenol for the pain. (Tr. 1614).

From September 6th to October 5th Scott presented to NP Cates and Dr. Landers six times for right shoulder pain after lifting a five-gallon water jug, back pain, and a sore throat. (Tr. 1607, 1602, 1597, 1677, 1695, 1689). An x-ray on Scott's right shoulder taken on September 6th showed normal results. (Tr. 1658). On December 26, 2016 Scott presented to GPCH after closing his right pinky finger in a car door. (Tr. 1703). Treatment notes state he was ambulatory and diagnosed with a finger abrasion, finger contusion, and possible fracture. (*Id*.).

### g. 2017

On February 13, 2017 Dr. Sudhakar completed a Disability Form on which he wrote Scott "requires an assistive device at times for ambulation," must have the ability to shift between positions frequently at his discretion, and would miss more than two days of work per month due to his conditions. (Tr. 1731). On March 1, 2017 Scott presented to Dr. Sudhakar with complaints of pain in his feet, difficulty walking, and numbness in his hands. (Tr. 96). Treatment notes indicate Scott was in general health, but he reported fatigue, numbness, weakness, arthralgia, and myalgia. (Tr. 96–97). His motor tone and power were normal, and his gait and muscle tone were normal, with mild weakness in his lower limbs. (Tr. 99). Scott was instructed to continue his current medications and to lose weight. (Tr. 100).

From June 20th to August 16th Scott presented to NP Cates four times for right thumb pain. (Tr. 34, 41, 47, 53). An x-ray on Scott's right thumb taken on June 20th showed normal results. (Tr.

40). He was diagnosed with multiple trigger fingers and De Quervain tenosynovitis and referred to Dr. Landers for further evaluation. (Tr. 51).

On September 6, 2017 Scott presented to Dr. Sudhakar with complaints of low back pain and numbness in his hands. (Tr. 21). Treatment notes indicate Scott was in good general health, but had blurred vision, numbness, arthralgia, and excess weight. (Tr. 96–97). His motor tone and power were normal and his gait was normal. (Tr. 24).

On September 28, 2017 Scott presented to NP Cates with complaints of a sore throat. (Tr. 59). Treatment notes indicate a normal musculoskeletal exam and treatment for bronchitis. (Tr. 62–63).

On October 5, 2017 Scott presented to GPCH ER with complaints of coughing and feeling like his lungs were filling with fluid. (Tr. 16). Treatment notes indicate he was able to walk, was advised that the medication NP Cates prescribed to him on September 28th for bronchitis was still active in his system, and was discharged. (Tr. 18).

On November 1, 2017 Dr. Sudhakar completed an Attending Physician's Statement reporting Scott has the following diagnoses: lumbago, axonal sensory neuropathy, carpal tunnel, sleep apnea, and migraines. (Tr. 10). Sudhakar reported as objective findings Scott's decreased sensation in the distal lower limbs and radial aspect of both hands, lumbago, and pain on ambulation. (*Id.*). The statement also indicated Scott was referred to PT but cannot afford it, and was referred to a sleep lab to evaluate his complaints of sleep apnea but cannot wear the mask. (*Id.*). Dr. Sudhakar opined Scott cannot walk, sit, or stand for more than 15 minutes and his condition is unlikely to change. (Tr. 14).

### 3. Hearing Testimony

#### a. Scott

On January 19, 2017 Scott, represented by counsel, testified in a hearing before the ALJ. (Tr. 182). Scott testified he weighed 261 pounds and that his activities had decreased in the past several months. (Tr. 196). He is unable to pick up his granddaughter, which has caused depression. (Tr. 196). He has injured himself trying to walk and needs help around the house. (*Id.*). He has issues holding

onto things with his hands because of numbness, and has trouble operating a keyboard and handling small things such as buttons. (Tr. 196, 205). He has numbness, tingling, and burning in his calves that goes down to his feet, thus, he reclines as much as possible. (Tr. 199). He stated his pain has worsened, but he cannot afford his pain medication; consequently, he takes it sparingly even when the pain is excruciating. (Tr. 196). Scott testified he has asked Dr. Sudhakar to increase his medication dosage or prescribe something else, but he cannot afford other medications without insurance or income. (*Id*.). Scott testified he can walk about 50-75 feet without an assistive device. (*Id*.).

Scott elevates his feet "probably 90 percent of the time" and gets a burning sensation in his feet and numbness from the top of his left hip to his left foot if he stands for eight to ten minutes. (Tr. 200–01). He has broken toes due to his balance issues and attempting to walk without his cane. (Tr. 201). He uses handrails when navigating his house and holds on to things, such as an entertainment center or book shelf when moving around. (*Id*.). He uses a shopping cart at the grocery store to support him as he walks, or a riding cart if he plans to be there a while. (*Id*.). He testified he uses a cane Dr. Sudhakar prescribed in 2010, but that he does not need the cane when he visits places like the Fritch Clinic because it is only 35-40 feet from his car to the waiting room. (Tr. 202–03). On "good days" he tries to "push his limits" and walks without his cane to stay active; however, he has more bad days than good days because he cannot afford his pain medication. (Tr. 203).

Scott stated he has severe headaches that last up to 12 hours and occur three to four times a month, but he cannot afford the medication to treat his headaches. (*Id*.). He testified he has "central hypo apnea" and needs oxygen, but the indigent care he receives does not cover oxygen. (Tr. 204). The hallux valgus defects, big toe issues, plantar fasciitis, bone spurs, and displaced bones around his big toe make it difficult to walk and stand. (Tr. 206). Scott had surgery to release triggering in his left ring finger in 2010; nevertheless, he still has triggering in both hands that makes it difficult to hold and carry things. (Tr. 207, 1484). He also has problems hearing in both ears. (Tr. 217). Scott testified he made $300-$400 from gun sales per year for the last few years. (Tr. 208–09).

### b. Hill

Marsha Hill, a vocational expert ("VE"), also testified at the hearing before the ALJ. The VE summarized Scott's PRW as follows:

- An armored car guard and driver (Dictionary of Occupational Titles ("DOT") Code 372.563-010; medium; semiskilled; SVP 3);

- A military police officer (DOT Code 375.263-014; medium; skilled; SVP 6);

- A guard (DOT Code 372.667-038; light; semiskilled; SVP 3);

- A police officer III non-military (DOT Code 211.462-101; light; heavy as performed; unskilled; SVP 2); and

- A communications equipment technician (DOT Code 828.261-022; medium; skilled; SVP 7). (Tr. 211–12).

The ALJ asked the VE to consider a hypothetical person with the same age, education, and work experience as Scott, who could lift and carry/push and pull ten pounds occasionally and less than ten pounds frequently; stand or walk for two hours in an eight-hour day for 15 minutes at a time; sit for six hours in an eight-hour day; occasionally climb stairs and ramps, but never ladders ropes, or scaffolding; occasionally balance, bend, stoop, kneel, crouch, or crawl; and could do simple, routine tasks. (Tr. 213). When asked if such a person could perform Scott's PRW the VE testified such a person could not because the work was too heavy and skilled; however, such a person could perform other work available in the national economy within those restrictions, such as the sedentary jobs of: document specialist (DOT Code 249.587-018; SVP 2; national numbers of at least 57,000); touch-up screener (DOT Code 726.684-110; SVP 2; national numbers of at least 24,000); and food and beverage order clerk (DOT Code 209.567-014; SVP 2; national numbers of at least 40,000). (Tr. 214).

The ALJ then asked whether the same hypothetical individual could do those or other competitive jobs in the national economy if he had to miss two or more days of work per month. (*Id*.). The VE responded such a person could not do those or other jobs on a sustained basis because two or more days of leave per month exceeds what employers will customarily tolerate. (*Id*.). The VE testified

that if the same hypothetical person could only sit for 30 minutes at a time and needed to change positions at his discretion between sitting and standing, he could only perform the job of document specialist. (*Id*.). If the same hypothetical person needed to elevate his feet to chair level because of numbness and pain half the time he was sitting, the VE testified such a person could not perform any of the three jobs listed. (*Id*.). Further, if the same person needed more than a ten-minute morning break, a 30-minute lunch break, and an afternoon break, he would need an accommodation and could not perform any of the three jobs on a sustained basis. (*Id*.). Lastly, the VE testified that "if an individual needs to use a cane to ambulate or to stand and their job requires them to carry something, then they would not be able to maintain employment unless they have an accommodation such as a cart or something to that nature." (*Id*.).

### 4. ALJ's Decision

The ALJ found Scott had not engaged in substantial gainful activity from his amended onset date of September 21, 2011 through the date he was last insured, September 30, 2015. (Tr. 71). The ALJ found Scott has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, left great toe deformity, a cardiovascular impairment with decreased ejection fraction, and depression, but that such impairments do not meet or medically equal the severity of one of the listed impairments in the social security regulations. (Tr. 72). The ALJ determined Scott has the residual functional capacity (RFC) to perform a limited range of sedentary work. Specifically, the ALJ found that Scott can lift and carry/push and pull ten pounds occasionally and less than ten pounds frequently, can stand or walk for two hours in an eight-hour day but can only stand or walk for 15 minutes at a time, can sit for six to eight hours in an eight-hour workday, can occasionally balance, stoop, bend, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladders, ropes, or scaffolding, and can perform simple, routine tasks. (Tr. 74). As a result, the ALJ found Scott cannot perform any of his PRW. (Tr. 83). However, considering Scott's age, education, and work experience, the ALJ found there were other jobs in the national economy Scott could perform and determined there was no

disability from the onset date to the date last insured. (Tr. 85). Consequently, the ALJ denied Scott

benefits. (Tr. 68–85).

## II. STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to

determining (1) whether substantial evidence exists in the record, considered as a whole, to support the

Commissioner's factual findings and ultimate decision, and (2) whether the Commissioner applied the

correct legal standards or if any errors of law were made. *Kinash v. Callahan*, 129 F.3d 736, 738 (5th

Cir. 1997). To determine whether substantial evidence of disability exists, the Court must consider four

elements of proof: (1) objective medical facts; (2) diagnoses and opinions of treating and examining

physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age,

education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v.

Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive,

and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the

court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d

1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the

courts. *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). Substantial evidence is "such relevant

evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla

and less than a preponderance." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). Only a "conspicuous

absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial

evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Stated differently, the level of review

is not *de novo*. If the Court finds substantial evidence to support the Commissioner's decision, the

Court must uphold the decision. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

### III. ISSUES

The ALJ found Scott not disabled at step five of the five-step sequential analysis. Consequently, this Court's review is limited to whether there was substantial evidence in the record, taken as a whole, to support the ALJ's finding that Scott had the ability to perform other work in the national economy, and whether proper legal standards were applied in making this determination. Scott asserts the acting Commissioner's decision denying him benefits should be reversed because:

1.     The ALJ committed reversible legal error by failing to properly consider a medical opinion of one of Scott's treating physicians; specifically, Dr. Sudhakar's opinion that Scott "requires an assistive device for ambulation;" and

2.     In addition to or alternatively, the ALJ's RFC finding is not supported by substantial evidence in that it includes the implicit finding that Scott does not "need" or "require" (to any extent) the use of a cane for ambulation; consequently, the ALJ's ultimate finding of non-disability is not supported by substantial evidence.

### IV. ANALYSIS

**A.  The ALJ did not err in evaluating treating source medical opinions in the record.**

Scott initially alleges the ALJ legally erred by failing to properly evaluate Dr. Sudhakar's statements in the record concerning his "need" for a cane to ambulate. Specifically, Scott contends such statements made by Dr. Sudhakar, a treating source, and expressed in various medical records and evaluation documents constituted medical opinions concerning Scott's physical limitations or impairments. Scott further argues the ALJ not only failed to give proper weight to these medical opinions or otherwise properly evaluate said opinions, but also that such failure prejudiced Scott resulting in reversible error.

In determining whether a claimant is disabled for the purpose of awarding disability benefits, the medical opinion of a treating source is generally entitled to considerable weight because of the source's familiarity with the claimant's impairments, treatments, and responses. *Leggett v. Chater*, 67

F.3d 558, 566 (5th Cir. 1995).[1] The medical opinion of a treating source on the "nature and severity" of a claimant's impairment will be given "controlling weight" if the medical opinion is (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is not inconsistent with the other substantial evidence in the claimant's case record. 20 C.F.R. § 404.1527(c)(2); *see Martinez v. Chater*, 64 F.3d 172, 175–76 (5th Cir. 1995).

An ALJ may, however, "reject" the medical opinion of a treating source – that is, give the treating source medical opinion "less weight, little weight, or even no weight," *Perez v. Barnhart*, 415 F.3d 457, 465–66 (5th Cir. 2005) – when:

    (1) the evidence supports a contrary conclusion; and

    (2) good cause is shown – such as when a treating source's statements or evidence is:

        (a) brief and conclusory,

        (b) unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or

        (c) otherwise unsupported by the evidence.

*Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000). However, if declining to give a treating source medical opinion "controlling weight," an ALJ must consider the following factors set forth under 20 C.F.R. § 404.1527(c) in determining the weight to give to that treating source medical opinion:

    – the treating source's length of treatment of the claimant;

    – the treating source's frequency of examination;

    – the nature and extent of the treatment relationship;

    – the support of the treating source's opinion afforded by the medical evidence of record;

    – the consistency of the opinion with the record as a whole; and

---

[1] A "treating source" is an "acceptable medical source" who has provided a claimant with medical treatment or evaluation and who has had an "ongoing treatment relationship" with the claimant with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical condition. 20 C.F.R. § 404.1527(a)(2). A "medical opinion" is a statement from an acceptable medical source that reflects judgments about the nature and severity of a disability claimant's impairments. *Id*. § 404.1527(a)(1).

– the specialization, if any, of the treating source.

*Id*. at 455.

If controverting medical opinions from *treating <u>or</u> examining* sources exist that compete with the treating source opinion the ALJ is declining to give controlling weight, then the ALJ is not rejecting the <u>sole</u> relevant medical opinion of a treating source in the record and the detailed factor analysis with regard to the treating source medical opinion receiving less than controlling weight is <u>not</u> required. *See Qualls v. Astrue*, 339 Fed. Appx. 461, 467 (5th Cir. 2009). A one-time consultative examination wherein the examining source simply tracks a claimant's symptoms at the moment of the examination and does not address or explain how a claimant's medical conditions may or may not result in work-related limitations does not amount to a competing "controverting medical opinion." *Beltran v. Berryhill*, No. 3:16-cv-2072-M-BN, 2017 WL 4167513, at *4 (N.D. Tex. Sept. 20, 2017); *Osborn v. Berryhill*, No. 3:16-cv-44-B-BN, 2017 WL 2312910, at *4 (N.D. Tex. May 11, 2017); *Wilkerson v. Berryhill*, No. 3:16-cv-851-BN, 2017 WL 1091601, at *3 (N.D. Tex. Mar. 23, 2017).

Regardless of the weight given a treating source's medical opinion as to what a claimant can still do despite impairments and/or any restrictions as a result of said impairments, it is still the ALJ's ultimate responsibility to evaluate a claimant's RFC based on the record as a whole; further, it is the ALJ's "sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455; *see Villa v. Sullivan*, 895 F.2d 1019, 1023–24 (5th Cir. 1990) (opinions from medical sources that a claimant is "disabled" or "unable to work" are "opinions on issues reserved to the Commissioner because they are administrative findings dispositive of a case" and are not treated as "medical opinions.").

Here, Scott argues the ALJ procedurally erred in evaluating Dr. Sudhakar's statements that Scott "needs" a cane for ambulation. Dr. Sudhakar qualifies as a treating source because he is a neurologist who has treated Scott for the severe impairment of degenerative disc disease of the lumbar

spine since 2010. Scott claims the following are "medical opinions" of a treating source entitled to controlling weight:

- Dr. Sudhakar's December 13, 2010 prescription for a cane for "daily use" (Tr. 1313);

- Dr. Sudhakar's answer on a January 11, 2011 insurance form that stated Scott had the "present limitation" of using a cane to walk (Tr. 1306);

- Dr. Sudhakar's May 4, 2012 memorandum stating Scott was "prescribed a walking cane to help his gait as he complained of back pain" (Tr. 1314–15);

- Dr. Sudhakar's August 11, 2015 notes that state Scott's gait was abnormal and that he needed a cane to walk (Tr. 1489);

- Dr. Sudhakar's notes on an August 12, 2015 insurance form that state Scott uses a cane (Tr. 1720); and

- Dr. Sudhakar's February 13, 2017 response of "yes" to a written question that asked, "Does your patient still require an assistive device at times for ambulation?" (Tr. 1731).

Scott contends that in giving Dr. Sudhakar's medical opinion that he "needs" a cane for ambulation little or no weight, the ALJ legally erred by not setting forth in his decision the detailed factor analysis under 20 C.F.R. §§ 404.1527(d)(2) and 416.927. Again, as noted above, the detailed factor analysis of the treating physician's rejected medical opinions is required *only* if there are no other reliable medical opinions from other treating or examining sources that controverts the treating source opinion the ALJ is declining to give controlling weight.

Here, the detailed factor analysis was not necessary. The ALJ could reject Dr. Sudhakar's statements that Scott "needs" a cane "without performing a factor by factor analysis because there was competing first-hand medical evidence, including [Dr. Sudhakar's] own treatment record, that supported a contrary conclusion." *See Boothe v. Colvin*, No. 3:12-CV-5127-D, 2013 WL 3809689, at *4 (N.D. Tex. July 23, 2013) (Fitzwater, C.J.) (citing *Berry v. Astrue*, No. 3:11–CV–02817–L (BH), 2013 WL 524331, at *18–19 (N.D. Tex. Jan. 25, 2013)). Dr. Sudhakar's own treatment notes, as well as Dr. Nambiar's, another treating source, contradicts Dr. Sudhakar's opinion that Scott "needs" a cane to walk.

Dr. Sudhakar's August 11, 2015 treatment notes constitute the only medical opinion within the relevant time period that Scott "needs" a cane to walk.[2] (Tr. 1489). The treatment notes state, "Gait is abnormal needs a cane to walk." (*Id.*). This conclusion is contrary to Scott's treatment record. *See Boothe*, No. 3:12-CV-5127-D, 2013 WL 3809689, at *4. In assigning little weight to Dr. Sudhakar's opinion, the ALJ cited the following contradictory treatment notes regarding Scott's gait:

- Dr. Sudhakar's June 7, 2012 treatment records showing <u>Scott was in good general health, had a normal gait, and normal muscle strength and tone.</u> (Tr. 934–37) (emphasis added).

- Dr. Sudhakar's July 11, 2013 treatment records showing Scott's <u>motor tone and power were normal, and his gait and muscle strength and tone were normal.</u> (Tr. 1093) (emphasis added).

- Dr. Sudhakar's March 16, 2015 treatment notes showing Scott's <u>motor tone and power were normal, and his gait and muscle tone were normal.</u> (Tr. 1388) (emphasis added).

In further support of his conclusion, the ALJ cited the medical records of Dr. Nambiar, a treating source, who examined Scott three times from August 2014 to June 2015. On August 4, 2014, Dr. Nambiar noted Scott's gait appeared unsteady and that he *used* a cane. (Tr. 1406). Dr. Nambiar's later treatment notes state Scott's gait, strength, and posture were normal.[3] (Tr. 1416, 1593).

For these reasons, the ALJ was not required to perform the six-factor analysis.[4] Therefore, a discussion of whether the ALJ's failure to include the detailed factor analysis in his decision resulted

---

[2] The relevant time period spans from the onset date of September 21, 2011 to September 30, 2015, the date Scott was last insured. (Tr. 69).

[3] Although it is outside the relevant timeframe and also is based on treatment by a nurse practitioner rather than a treating physician, the Court notes that there is other recent evidence that is consistent with the ALJ's finding Scott does not "need" a cane. NP Hardin's July 29, 2016 treatment notes state, "The patient has long standing history of chronic low back pain and has been on different pain medications in the past. On exam today there is no indication on exam of any change from previous visit. He is fully ambulatory without ambulatory devices at this office visit." (Tr. 1621). Additional notes outside the time period in question from Scott's December 26, 2016 visit to GPCH state he was ambulatory. (Tr. 1703). Treatment notes from GPCH ER dated October 5, 2017 state the inability to walk was absent. (Tr. 17).

[4] With respect to Dr. Sudhakar's statement that Scott "needs" a cane because of gait abnormalities, the ALJ was presented with multiple contradictory treatment notes from two treating physicians—Dr. Sudhakar and Dr. Nambiar. The ALJ was entitled to rely on this evidence alone to conclude Scott does not need a cane. The Court notes the ALJ also cited examination records of Dr. Burgesser, an examining source who saw Scott on two occasions (January 26, 2010 (Tr. 1139–50) and June 11, 2013 (1083–1088)), which are consistent with Dr. Sudhakar and Dr. Nambiar's contradictory treatment notes that Scott's gait is normal and support the ALJ's finding. However, because the ALJ did not rely solely on the opinion of an examining source, Dr. Burgesser, when giving Dr. Sudhakar's statement that Scott "needs" a cane less than controlling weight, the ALJ did not commit error.

in prejudice to Scott and, thus, amounted to reversible error, is unnecessary. Scott's first ground should be denied.

**B. Substantial evidence supports the ALJ's RFC finding and ultimate finding of non-disability.**

The ALJ found Scott has the RFC to perform sedentary work, lift/ carry and push/pull ten pounds occasionally and less than ten pounds frequently; stand or walk for two hours in an eight-hour day but can only stand for 15 minutes at a time or walk for 15 minutes at a time; sit for six to eight hours in an eight-hour workday; occasionally balance, stoop, bend, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolding; and can perform simple, routine tasks. (Tr. 74). By his second ground, Scott claims the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to include a restriction that Scott *needs* or *requires* a cane for ambulation and balance. In turn, Scott argues the defective RFC finding was crucial in determining Scott could perform the other work discussed by the VE. The sedentary occupations proposed by the VE require an employee to carry things, and Scott argues his "need" for a cane to ambulate and balance, based on the VE testimony, preclude him from performing these jobs. [ECF 15 at 18]. Scott thus concludes the ALJ's ultimate finding of non-disability is not supported by substantial evidence.[5] [ECF 15 at 19].

---

[5] Scott initially appears to argue the ALJ's RFC finding, which did not include the requirement of a cane for ambulation and balance, cannot stand because it is inconsistent with his finding at step two that Scott's severe impairments "could reasonably be expected to cause the alleged symptoms," the "need" for a cane being a "symptom" alleged by Scott. Scott appears to reason that these two findings are at odds with each other. Although the ALJ identified Scott's "medically determinable impairments" he found to be severe and stated said impairments "could reasonably be expected to cause the alleged symptoms" (Tr. 75), he also noted Scott's statements concerning the "intensity, persistence, and limiting effects" of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id*.). The ALJ also clarified that the medical findings supported only the limitations listed in the RFC. (Tr. 76). While the ALJ found the severe impairments could reasonably be expected to cause the alleged symptoms, he also found the medical evidence showed the symptoms were not as disabling and limiting as Scott claimed. (Tr. 75–76). To the extent, if any, Scott is arguing any inconsistency between the ALJ's RFC finding and his findings at step two demonstrate the RFC finding is not supported by substantial evidence, Scott's argument is without merit.

The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). The determination of an applicant's RFC is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2). RFC's are "not medical opinions ... they are administrative findings." *Id*. § 404.1527(d). In determining the RFC, a medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation and who also has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). The ALJ's RFC decision can be supported by substantial evidence, even if he does not specifically discuss either all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id*. (citations omitted). Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if

there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988) (citations omitted).

Scott argues the following specific "opinions" expressed by Dr. Sudhakar definitively demonstrate Scott's "need" for a cane that should have been included in the RFC[6]:

- Dr. Sudhakar's December 13, 2010 prescription for a cane for "daily use" (Tr. 1313);

- Dr. Sudhakar's answer on a January 11, 2011 insurance form that stated Scott had the "present limitation" of using a cane to walk (Tr. 1306);

- Dr. Sudhakar's May 4, 2012 memorandum stating Scott was "prescribed a walking cane to help his gait as he complained of back pain" (Tr. 1314–15);

- Dr. Sudhakar's August 11, 2015 notes that state Scott's gait was abnormal and that he needed a cane to walk (Tr. 1489);

- Dr. Sudhakar's notes on an August 12, 2015 insurance form that state Scott uses a cane (Tr. 1720); and

- Dr. Sudhakar's February 13, 2017 response of "yes" to a written question that asked, "Does your patient still require an assistive device at times for ambulation?" (Tr. 1731).

The ALJ expressly considered Dr. Sudhakar's opinion that Scott uses an assistive device and cited the following on page 81 of the administrative record:

- Dr. Sudhakar's June 7, 2012 treatment records showing Scott was seen for low back pain and foot pain. (Tr. 934). <u>Scott was in good general health, had a normal gait, and normal muscle strength and tone</u>, but had abnormal mild weakness in hip flexion on right side, dizziness, headaches, and numbness in his feet. (Tr. 934–37) (emphasis added). Dr. Sudhakar also noted decreased sensation with pin prick in Scott's lower limbs. (*Id.*).

- Dr. Burgesser's treatment notes from a June 11, 2013 examination indicating Scott:

  (1) has a probable spondylosis at L5 with no acute bony abnormality, based on a contemporaneous lumbar spine x-ray (Tr. 1083);

  (2) has a hallux valgus deformity on his left foot based on a contemporaneous x-ray (Tr. 1084); had pain in his mid and lower back, and pain with straight leg raising, but could bend over and touch toes (Tr. 1086);

---

[6] The Court notes that these are the same items that Scott claims are medical opinions of a treating source entitled to controlling weight. *See infra*, Section IV. A.

(3) walked with a cane, but has a normal gait and could sit, stand, move about, lift carry and handle objects, reach, handle, and finger-feel (*Id*.); and

(4) could not heel-toe walk, hop, or squat, but had no fatigue or shortness of breath. (*Id*.).

- Dr. Sudhakar's July 11, 2013 treatment records showing Scott presented for low back pain, pain in his lower limbs, and burning feet. (Tr. 1090). Scott was not in good general health, had fatigue, double vision, sinusitis, headaches, numbness, shortness of breath, coughing, wheezing, arthralgia, myalgia, and excess weight. (Tr. 1090–92). <u>His motor tone and power were normal, and his gait and muscle strength and tone were normal.</u> (Tr. 1093) (emphasis added).

- GPCH's July 19, 2013 treatment notes when Scott was seen for back pain that started when he was pulling up carpet at his home. (Tr. 1101–02). <u>An x-ray of his lumbar spine showed minimal degenerative changes</u>, and he was diagnosed with a low back strain, given a prescription for Flexeril, and discharged. (Tr. 1104) (emphasis added).

- Dr. Nambiar's October 2, 2014 treatment notes, in which Scott reported off and on chest pain. (Tr. 1414). <u>Treatment notes state his gait, strength, and posture were normal.</u> (Tr. 1416) (emphasis added). Dr. Nambiar advised Scott to continue his medication, follow a weight reduction plan, and increase his activity levels. (Tr. 1417).

- Dr. Sudhakar's March 16, 2015 treatment notes when Scott sought treatment for low back pain, burning pain in his feet, and sleep apnea. (Tr. 1713). Those treatment notes state Scott was in good general health and he had lost 30 pounds, but reported numbness, weakness, arthralgia, and myalgia. (Tr. 1713–15). <u>His motor tone and power were normal, and his gait and muscle tone were normal, with mild weakness in lower limbs.</u> (Tr. 1388) (emphasis added).

- Dr. Nambiar's June 11, 2015 treatment notes regarding Scott's hypertension and shortness of breath. (Tr. 1591). <u>Scott's gait was steady, his strength was strong, and his posture was normal.</u> (Tr. 1593) (emphasis added).

The totality of the medical evidence before the ALJ reflected Scott typically uses a cane even though he can walk without one. Specifically, the record shows the cane is used to an indeterminable degree for walking and balancing (Tr. 1083, 1116, 1177, 1314). Treatment notes, however, reflect Scott has a normal gait and often do not mention a cane. Scott acknowledges this in his pleadings and concedes the record contains evidence of both normal and abnormal gait and use of and absence of a cane. [ECF 15 at 20]. Scott testified that he sometimes walks as far as 40 feet without a cane. (Tr. 201–03). At the last hearing, he testified that he can walk somewhere between 30 and 100 feet without the use of a cane. (Tr. 197, 201–02). The form Dr. Sudhakar completed on February 13, 2017 wherein he

noted Scott "requires an assistive device at times for ambulation" reflects what could legitimately be interpreted as an elective and occasional use of a cane rather than a continual, necessary use to ambulate. (Tr. 1731). Neither Dr. Sudhakar's statement on the form, nor Scott's own testimony, indicates Scott continuously requires an assistive device or would require such in a work environment.

Further, the ALJ recited objective medical evidence that contradicted Dr. Sudhakar's opinions and was free to choose among the treating and examining physicians' conclusions, even though one is the claimant's treating physician. *See Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) ("[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."); *see also Wilson v. Colvin*, No. 1:13-CV-00042- BL, 2014 WL 4230003, at *4 (N.D. Tex. Aug. 25, 2014). At most, the objective medical evidence shows Scott typically uses a cane when ambulating but fails to show the continuous necessity of a cane for rising to a standing position and walking short distances, such as in a work setting.[7] Scott has not shown the ALJ's RFC finding is not supported by substantial evidence, nor that the ALJ's finding of non-disability is not supported by substantial evidence. Scott's second ground should be denied.

## V.    RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States Senior District Judge that the decision of the Commissioner be AFFIRMED.

---

[7] Inconsistencies regarding Scott's need for a cane appear throughout the record. For example, Dr. Sudhakar stated on a form filled out on July 2, 2013 that Scott "cannot do any work for now." (Tr. 1312). However, on July 19, 2013 Scott presented to GPCH ER complaining of back pain. (Tr. 1101). Treatment notes state Scott injured his back while "pulling up carpet." (*Id.*).

## VI.    INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these Findings, Conclusions, and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED February 28, 2019.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions, and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions, and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), as recognized in *ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).